## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| YUEPING DU | * |
| C/O JIE DU, HIS POWER OF ATTORNEY | * |
| 26296 W. Fremont Road | * CIVIL ACTION NO. _____ |
| Los Altos Hills, CA 94022 | * |
| | * |
| and | * |
| | * |
| FEI CHEN | * |
| C/O JIE DU, HER POWER OF ATTORNEY | * |
| 26296 W. Fremont Road | * |
| Los Altos Hills, CA 94022 | * |
| PLAINTIFFS, | * |
| v. | * |
| | * |
| BIN HAO | * |
| 2783 Middleton Farm Ct. | * |
| Tysons, VA  22102 | * |
| | * |
| and | * |
| | * |
| YE YUAN A/K/A ASHLEY YUAN | * |
| 2783 Middleton Farm Ct. | * |
| Tysons, VA  22102 | * |
| | * |
| and | * |
| | * |
| QIDIAN LLC | * |
| | * |
| Registered Agent: Bin Hao | * |
| 7925 JONES BRANCH DRIVE, STE 4350 | * |
| TYSONS, VA  22102 | * |
| | * |
| DEFENDANTS. | * |

## COMPLAINT FOR VIOLATION OF SECTION 10(b) AND RULE 10b-5 of EXCHANGE ACT OF 1934

Plaintiffs Yueping Du and Fei Chen (each a "Plaintiff," and collectively, "Plaintiffs"), by and through their undersigned counsel, allege against Bin Hao ("Hao"), Ye Yuan a/k/a Ashley Yuan ("Yuan"), Qidian LLC ("Qidian" and collectively, "Defendants") as follows:

### PARTIES

1. Plaintiffs are spouses and residents of and domiciled in China.  Jie Du, their daughter, who brings this claim as their power of attorney, is a resident of the state of California.

2. Based on his last known address, Defendant Hao is a resident of the Commonwealth of Virginia and resides in Fairfax County, Virginia.  He is the owner and manager of Qidian LLC, which is based out of Tysons, Virginia, and serves as its resident agent.

3. Defendant Yuan's last known address is in Fairfax County, Virginia.  She currently serves as the president of a private preparatory school located in New Windsor, Maryland, and is likely a resident of that state.

4. Defendant Qidian is a Virginia limited liability company with a registered address of 7925 Jones Branch Dr., Ste. 4350, Tysons, VA  22102.  The registered agent is Bin Hao.

5. Plaintiffs invested $650,000.00 with Hao and Qidian in various real estate development projects in Washington, D.C. and Miami, Florida.

6. Defendants Hao and Qidian were at all relevant times unregistered with the Securities Exchange Commission ("SEC") and Financial Industry Regulatory Authority ("FINRA") as a broker-dealer.

7. Defendants Hao and Qidian were at all relevant times unregistered with the SEC and FINRA as an investment advisor.

8. Defendants Hao and Qidian did not register any securities offering in connection with the funds Plaintiffs invested, and did not file a Form D in connection with an unregistered securities offering exempt from the registration requirements of Section 5 of the Securities Act.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over the action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.A. $ 78aa and 28 U.S.C.A. § 1331.

10.  Venue in this District is proper pursuant to Section 27 of the Exchange Act.  Certain of the acts, transactions, and occurrences constituting the violations alleged herein occurred, at least in part, in the District of Columbia, and were affected, directly or indirectly, by making use of the means and instrumentalities of interstate commerce, including telephone communications and electronic communications.

11. Further, jurisdiction is also proper under 28 U.S.C.A. §1332, as the amount in controversy exceeds $75,000.00, and Plaintiffs are foreign citizens residing in China, and Defendants are entities or individuals organized and residing, as applicable, in the Commonwealth of Virginia, the District of Columbia and possibly other states.

## FACTS

12. In 2017, Defendant Yuan solicited funds of Plaintiffs through their daughter and attorney in fact, Jie Du ("Ms. Du"), to invest in real estate.

13. Such advertisements were posted online through her website http://prolandian.com and through social media postings on the "WeChat" application starting in 2013.

14. The solicitation was general in nature, and highlighted attractive returns by offering potential investors the opportunity of an investment contract secured by U.S. real estate.

15. Yuan introduced Ms. Du to Hao, who she claimed owned and managed Qidian.

16. At the time, Yuan was married to Hao.  The parties have since divorced.

17. Qidian is currently owned and managed by Hao.  Upon information and belief, at the time when Plaintiffs invested funds with Hao, Qidian and Yuan, Yuan also owned a part of Qidian.

18. Yuan and Hao promoted the idea of investing with them in United States real estate ventures, along with other Chinese individuals. Yuan and Hao indicated that a number of individuals were interested, and that they offered a "safe" and "secure" investment platform targeted at and unique to Chinese investors.  According to Qidian's website solicitations, the platform was billed as "First ever United States real estate crowd funding platform for Chinese Americans/Started 2014".  The project specific web pages each cited "Legal Agreements/Guaranteed Principal Protection/Guaranteed interest protection", "Investors own 100% equity of the project before exiting" and "construction completion guarantee/pledge guarantee/joint guarantee responsibility".

19. Hao and Yuan formed Qidian as a parent company that managed and, upon information and belief, partially owned sub-entity lending vehicles ("Lending SPVs"), through which investors such as Plaintiffs would funnel money.  The Lending SPVs had no assets other than funds from Plaintiffs and other investors, and any corresponding loan agreements from a project entity developer.

20. Specifically, Hao and Yuan formed or caused to be formed the Lending SPVs that corresponded with the projects listed in the chart attached as Exhibit A. The chart also lists the project name, if applicable, and the amount of funds Plaintiffs invested for each project and the corresponding Plaintiff, the date of the Subscription Agreement (defined below), the initial and final maturity dates and the expected return on investment. All of this information is incorporated herein by reference and alleged to be truthful and accurate.

21. The proceeds invested by Plaintiffs, as listed in Exhibit A, are collectively referred to herein as the "Loans". The Loans corresponded to real properties located in Washington, D.C. ("DC Property") and Miami, Florida (collectively, the "Miami Properties" and together with the DC Property, the "Properties"), all as described in detail in Exhibit A.

22. The DC Property developer was Greshaun Fulgham ("Fulgham"). The entity holding legal title to the DC Property was 1103 Ventures LLC.

23. The Miami Properties developer was Richard Trinidad and his wife Kelly Beam. Together they own an entity called Metronomics, Inc. ("Metronomics"). Metronomics is the parent entity for the various Project SPVs listed in Exhibit A that hold legal title to the Miami Properties.

24. In exchange for the Loans, Plaintiffs received a "Non-Recourse Borrower Dependent Promissory Note" for each of the Properties (the "Notes" and each individually, a "Note"), which are attached as Exhibit B, nominally issued in the name of each corresponding Lending SPV.

25. Hao and Yuan formed a scheme whereby they created Lending SPVs through which to nominally channel investors' money into single purpose, project level entities ("Project SPVs") , that themselves were sub-entities of the real estate developer or their affiliated

entity (Fulgham and Metronomics).   The Project SPVs' only asset was title to the underlying real estate.   Generally speaking, the real estate developer would secure acquisition funding through a private or "hard money" first lien senior lender, whose loan was secured by a deed or trust or mortgage on the project.   Hao and Yuan pooled funds from Plaintiffs and other investors to provide the project developer with unsecured, mezzanine loan funding (the "Mezz Funds").   Qidian received upfront fees for sourcing the funds, payable out of the Mezz Funds proceeds.   Qidian also received a joint venture equity stake in the Project SPV that it had no obligation to share with Plaintiffs or other investors.   In return, Qidian offered to Plaintiffs and other investors a "Non-Recourse Borrower Dependent Promissory Note" issued by the Lending SPVs, which promised payment of a return consisting of two parts, an annual rate of interest paid quarterly and an additional premium rate paid at a nominal maturity date based upon the projected project completion.   Repayment of principal and return was entirely contingent on receipt of funds from the project level sub-entity.

26. In the executive summary advertisements for the Properties, Qidian represented that it would issue an explicit promise or guarantee of repayment to Plaintiffs: "Qidian will sign performance and completion guarantees and interest payout guarantees and other agreements to insure project complete and on time, and protect investor's principal and interest."   It also represented: "Qidian will conduct overall supervision of the project during the whole duration of the project, monitor construction progress, permitting, interest payout, principal pay back and every step of the project, also will provide investors project progress updates on a regular basis."   It also represented: "Before the start of the project, Qidian conduct 360 degree due diligence work including project capital structure and

return, market environment, financial projection on return of investment, project team, legal procedure and every state that would influence the project." In an email on July 15, 2019 to all investors including Plaintiffs, Hao reiterated that a Qidian guarantee existed with respect to repayment of Plaintiffs' money in full.

27. Hao and Yuan failed to disclose the upfront fees and the joint venture equity structure to Plaintiffs.

28. Hao and Yuan represented that the Mezz Funds were safe and secured, and that the Mezz Funds were a loan to a project developer with preferred interest. Hao and Yuan represented that this arrangement was in the best interest of Plaintiffs, as it removed them from direct ownership of real estate and corresponding potential liability.

29. Hao and Yuan failed to disclose the existence of the senior acquisition funding or the exact titling of the real estate assets. Initially, in 2017, Hao told Ms. Du that (a) Qidian is the developer (note: this is supported by WeChat postings by Qidian: "QD has an unique proposition. We are not just a fund raising platform, we are also the developer."), (b) all projects in which he invests are "under the close control of his company and team", (c) should something go wrong, his company still owns the land and can sell the property so the investment is safe. Furthermore, Hao and Yuan represented that the Lending SPVs and the real estate developer were providing all funds, and the Mezz Funds were secured by real estate and certain guarantees of the developer and would be first in priority should a default occur. Hao further represented that he maintained strict oversight over the performance of the respective developers on each project, and the ongoing status of each project, in which Plaintiffs' funds were invested. Further, Hao and Yuan represented that

their close project and developer management would allow them to take over control of a defaulted or otherwise troubled project.

30. Hao also represented that he was savvy in raising capital, having been employed at a securities trading desk for some years, worked only with experienced developers who had proven track records of success and had performed extensive due diligence on the projects themselves before bringing them to market for investment consideration.  Each project solicitation touted the many decades of experience and tens of millions of dollars of real estate project value each developer had already developed.  The Qidian website boasts an "Excellent historical tracking record. 100% on time payback."  In short, Hao and Yuan convinced Plaintiffs that they could trust them because the projects were safe, with minimal risk of loss, based on the underwriting of the project and developer that they completed prior to soliciting funds for any investment opportunity and the completion and payment guarantees they and their company were providing.

31. Hao also represented that he invested his own money in the real estate development projects, and that his funds and developer funds were "the last ones out of a project", creating an equity margin of additional protection for investors like Plaintiffs.  According to the Qidian website: "QD has its own capital fund.  In every project, QD invests 10-15% of the total capital and puts its priority below the investors'.  QD requires the developer to put an additional 5-10% of its equity in the project.  These methods are designed to protect the investors' interests, which is similar to buying insurance for the investors' investment.  QD's primary goal is to ensure the investors get their principal and interests back in their pockets within the expected time frame."

32. As it turned out, the Mezz Funds were not in fact backed by a deed of trust on real estate, and were not senior in any way.  They were not in fact a direct loan to a developer, but rather an issuance of membership interests in the Lending SPVs.  Based on the Subscription Agreements (defined below), it is not clear whether the Mezz Funds were debt or equity, as they consist of a mixture of features of both types of investment types.  Ultimately, the Mezz Funds had no managerial power over the Lending SPV, no direct control of the real estate or developer, no security or collateral, and limited to no recourse upon a failure to return the principal and/or promised return.  Neither Qidian nor any entity directly and exclusively owned by Qidian, including the Lending SPVs, owned the title of any of the Projects, and could not control the fee title or the project site upon default of the developer. Qidian was certainly not the developer on any of the Projects.  Upon information and belief, no funds were invested by Qidian, Hao or Yuan for at least one of the Miami Properties.

33. This arrangement differs altogether from what Hao and Yuan represented as a "safe" and "secure" investment, is not consistent with the various other representations they offered and on which Ms. Du and Plaintiffs relied, and is not what a reasonable and sophisticated investor would want or expect given the amount of funds at risk.

34. In fact, in response to an email update to an investors' working group list from Hao in December 2019 that "Qidian merged all of its Miami investment with the developer Metronomics Inc.", Ms. Du even emailed Hao on December 17, 2019: "To Bin: My impression for my investment is that we invest in Qidian and Qidian will be managing the real estate projects on our contracts.  This is a huge surprise to me.  I wouldn't agree to invest if I know Qidian will invest in another party to deal with the project."

35. A Subscription Agreement was attached to each Note (each, a "Subscription Agreement"), which Plaintiffs electronically signed through a service provided by Hao called "Docusign".  *See* Exhibit B.  Hao signed on behalf of Qidian, as manager of the respective Lender SPV.

36. Hao told Plaintiffs just to sign the Subscription Agreements without reviewing their specific terms.  The Docusign program takes the reader directly to the signature line and prompts a one click trigger to indicate acceptance and execution.

37. Plaintiffs do not speak English.  The Notes and Subscription Agreements were written solely in English, although they do have some Chinese characters in the margins with incidental and non-material meaning.  Ms. Du is not a sophisticated real estate investor or financial advisor.  In fact, neither she nor Plaintiffs have any training, experience or specialized knowledge of investing or real estate, particularly with their Chinese heritage where only in the past few years has real estate even become more of a stand alone market. Plaintiffs had little to no meaningful review, and even less understanding, of what they were signing.

38. Accordingly, Plaintiffs and Ms. Du relied solely on the representations of Hao, Yuan and Qidian in making their investment decisions.  They implicitly trusted Hao, Yuan and Qidian to follow through on their representations and promises, particularly given their lack of knowledge and understanding of the real estate market, the English language, the United States practices and customs, financial instruments in general and this financing structure.  Their shared Chinese language and heritage was a significant additional factor in this creation of trust, of which Hao and Yuan specifically and explicitly took advantage

in soliciting funds, advertising projects and convincing Plaintiffs and other investors to invest.

39. After each Project reached a critical mass of funding, Hao delivered the proceeds to Fulgham and Metronomics without any construction hold back or other escrow.  Upon information and belief, Plaintiffs' funds were used to bridge the gap between the corresponding first lien lender loan and each respective Project purchase price and associated closing costs, as well as an advance for such soft costs as architectural plans and building permits, engineering schematics and so on.

40. Notwithstanding the immediately preceding allegation, upon information and belief, some of Plaintiffs' funds invested in the DC Property were retained and fraudulently converted by Fulgham for his own personal use and benefit.  The basis for this belief is that total funds lent, approximately $700,000 from the senior lender and $475,000 from the Lending SPV, exceeding the purchase price of roughly $1,000,000 and likely closing costs.

41. Hao, Yuan, Qidian and the applicable Lending SPV retained no control over such funds once disbursed to Fulgham and Metronomics.

42. Fulgham made few or no payments on the senior lien loan, which ultimately resulted in a foreclosure on the DC Property.  Based on information provided by the senior lender, he made little to no effort to obtain plans and permits, and performed no construction related activity - demolition or rehabilitation - whatsoever.

43. Hao and Yuan undertook a hands off approach toward supervision of the DC Property, and readily accepted Fulgham's representations that he would refinance the DC Property and repay the funds provided to him.

44. The DC Property was sold at foreclosure in March 2019 for an amount that was sufficient to repay the entire senior lien loan, with interest and fees, and provide a foreclosure surplus of approximately two hundred thousand dollars to Fulgham and/or 1103 Ventures LLC.

45. The foreclosure surplus should have been used to repay the Mezz Loans, but was not.  It is not immediately clear whether Hao, Yuan and Qidian received any of these funds.

46. Well after the foreclosure, Fulgham continued to represent to Ms. Du that he was attempting to refinance the DC Property, was "working on it", would be able to secure a payoff to Plaintiffs within "the next few weeks" or "30-60 days".  Likewise, Hao also perpetuated the fiction that Plaintiffs' money would be repaid well after the March 2019 foreclosure date.

47. It was only within the last month or so prior to the filling of this Complaint that Ms. Du and Plaintiffs learned of the foreclosure on the DC Property.

48. Since then, Hao has repeatedly represented to investors in the DC Property, including Plaintiffs and Ms. Du, that he and/or Qidian or the applicable Lending SPV would file a lawsuit against Fulgham to recover economic damages.  However, as recently as February 2021, Hao and Fulgham have texted each other on friendly terms with no mention of litigation or pending repayment.  Moreover, it appears that the website, https://aesendian.com, is actively seeking investors, and lists Bin Hao and Gresham Fulgham as "managing directors".  The contact number listed on the site is for Hao.  A screen shot of the "About Us" page is attached as Exhibit C.

49. Moreover, Hao cancelled the articles of BH Quincy LLC, the Lending SPV tied to the DC Property, in August 2019, and it is no longer an existing and valid entity.  Similarly, 1103

Ventures LLC, the title owner to the DC Property, is no longer a valid entity in good standing in Washington, D.C., having failed to file its annual registration statements.

50. The Subscription Agreement for the DC Property obligates Qidian as the manager of the Lending SPV for the DC Property to take all necessary and appropriate collection measures to recover funds as applicable.  It also requires Qidian to advance monies to a senior mortgagee in order to avoid a foreclosure or tax sale.

51. Qidian has not pursued any collection efforts against Fulgham whatsoever, and did not advance sufficient funds to ward off a foreclosure by the senior lender.

52. Such inaction is a default under and violates the applicable Subscription Agreement, and strongly suggests collusion between Hao, Qidian and Fulgham.

53. Hao has represented to Ms. Du that he has no money to repay the Mezz Funds, nor has he received any moneys from Fulgham.

54. The Miami Properties followed a similar fact pattern as the DC Property.  Hao caused Qidian and the applicable Lending SPVs to deposit all funds received from Plaintiffs and other investors to Metronomics and/or the Project SPVs.  Hao and Qidian conducted limited or no supervision or management of the Miami Properties.  Hao and/or Qidian, upon information and belief, executed similar joint venture arrangements with Metronomics and/or their affiliates as Fulgham, which he did not disclose to Plaintiffs. Metronomics and the Project SPVs started work on some of the Miami Properties, but ultimately made little overall progress toward final completion on the portfolio.

55. The Miami Properties were part of a larger portfolio of roughly 18 projects.  Metronomics obtained a senior lien from Fuse Funding to finance the acquisition costs for *some* but not

all of these projects. However, Metronomics and the affiliated Project SPVs cross collateralized their obligations under the loans they received from Fuse Funding with the entire Miami Properties real estate portfolio.

56. Hao represented to Plaintiffs and other Mezz Funds investors that the projects in which they invested were not encumbered by a senior lender, and that the monies tendered through Mezz Funds were sufficient, along with Metronomics funds, to acquire and develop the corresponding projects.

57. Notwithstanding the above, Qidian, Hao and the corresponding Lending SPVs transferred funds to Metronomics and affiliated entities with no security interest in the Properties or other meaningful collateral that a typical lender would require, no construction draw fund escrow, and without regard to whether there was a senior lien interest. This placed Plaintiffs' funds at high risk of loss, and much higher than what was represented to them.

58. A dispute arose between Metronomics and and Fuse Funding regarding the construction escrow and draw schedule, and the parties sued each other. The dispute was ultimately settled, but nevertheless Fuse Funding initiated foreclosure proceedings on the Miami Properties. Subsequently, Metronomics and/or its affiliates, including upon information and belief its principals, declared bankruptcy. The bankruptcy estate remains open.

59. Hao and other professionals involved in the bankruptcy estate have admitted that the trustee sale out of the bankruptcy estate will not yield sufficient funds to pay off the Fuse Funding senior lien as well as the Mezz Funds, including Plaintiffs' investments. Plaintiffs have lost their entire principal investment.

60. Had Hao, Yuan and Qidian performed their agreements and representations as required, including but not limited to requiring a security interest in each Property, supervising and

managing the Properties and respective developers, retaining full control over the real estate and/or entities that owned the real estate, and ensuring that Mezz Funds were used on Miami Properties without a senior lien, Plaintiffs would not have lost their investment. As a result, the loss incurred of Plaintiffs' investment funds is directly caused by the misrepresentations, omissions and failures of Hao, Yuan and Qidian.

61. The representations and omissions, promises and assurances made by Hao, Yuan and Qidian, as described in this Complaint, were material to the investment decision of Plaintiffs. Furthermore, Plaintiffs explicitly relied on same.

62. Plaintiffs believed and relied on the representations and promises Defendants proffered regarding supervision and management, real estate collateral, developer expertise and vetting, et cetera.

63. The financing structure places funds tendered by Plaintiffs and other investors at significant risk, contrary to the representations that their money was "safe" and "secure", given the potential for bankruptcy, conversion of funds, lack of safety controls such as a construction escrow and lack of collateral. Specifically, tendering millions of dollars to developers in a subordinate position without any security in the underlying real estate or other collateral, including individual payment guarantees and letters of credit, or direct control over the real estate or entities controlling the real estate, is not in conformity with industry standards for a loan or other investment of this size and risk class.

64. With a full understanding of the totality of the financial arrangement, no reasonable and sophisticated investor would have agreed to the terms and structure of the scheme propagated by Hao, Yuan and Qidian.

65. Plaintiffs would have *never* invested with Hao, Yuan and Qidian had they known that the representations, promises and assurances made were false, or that Hao, Yuan and Qidian were not going to perform in accordance with same.

66. Hao and Yuan knew the financing structure, representations and omissions and general scheme they created placed Plaintiffs' money at serious risk, but crafted the arrangement to benefit themselves by virtue of large upfront fees and upside equity potential through joint venture agreements with Fulgham and Metronomics.  Hao and Yuan also knew that providing a transparent account of the finance arrangement would cause Plaintiffs and investors like Plaintiffs not to invest in this scheme.  Accordingly, they omitted material pieces of information, including their form and amount of compensation, the lack of sufficient investor protection, including the complete absence of real estate collateral, the lack of management, et cetera, and the lack of efforts and/or insufficient efforts made to pursue Fulgham and Metronomics once a default occurred.  This includes the misrepresentations that went on for many months that Plaintiffs and other investors would be paid in a few weeks or a few months through a refinancing or buy out, all the while having no legitimate method to require the developers to disgorge the Properties or Mezz Funds in repayment.  The clear conflict of interest of Qidian, Hao and Yuan in taking a position of fiduciary duty in protecting Plaintiffs' investment and making clear representations to that effect, on one hand, and having a direct equity interest in the Projects and therefore a disincentive to exercise any limited remedies they may have had, on the other, contributed to Plaintiffs' losses.

67. Hao and Yuan intentionally deceived Plaintiffs through misrepresentations and omissions, as well as in the creation of the financing structure itself, in order to directly and

intentionally ingratiate themselves with fees and profits. Hao and Yuan created a 'fraud on the market' by virtue of their misrepresentations, omissions and scheme.

68. Plaintiffs and Hao on behalf of Qidian entered into the Subscription Agreements.

69. Section 1 of each Note states:

This Project Payment Dependent Note (the "Note") will correspond to a single loan secured by real estate (a "Corresponding Borrower Loan") that the Issuer has made or will make to a pre-screened real estate company (or an individual(s) operating a real estate business) that provides security for the loan (the "Borrower").

None of the Loans were secured by real estate, and there was no, or inadequate by commercially acceptable standards, security provided by the underlying Project SPV or developer.

70. Section 2.18 of each Subscription Agreement provides that Qidian "shall maintain on-time payments of [mortgage and mortgage escrow]" "to avoid any mortgage default." Qidian failed to maintain on-time mortgage payments with each of the respective senior lenders. The DC Property went to foreclosure as a result of such default, and the Miami Properties are in the foreclosure process currently, stayed only by the filing of a bankruptcy petition.

71. Section 3.3 of each Note states: "The Issuer will act in good faith (as defined in Article 1 of the Uniform Commercial Code) in taking action to collect the Corresponding Borrower Loan obligations, including, in its sole discretion, in enforcing its security interest in the assets pledged to secure Corresponding Borrower Loans." Qidian failed to take any collection action whatsoever with respect to the Properties.

72. The third page of the "Investor Package" attached as a summary of material terms to each Note lists the right of investors, including Plaintiffs, "to inspect certain books and records of the Company once every six months". Despite requests on May 2, 2020 and December

14, 2020 by Ms. Du directly to Hao and Qidian, and on February 8, 11, and 18, 2021 by undersigned on behalf of Plaintiffs to Qidian's attorney, for records and reports, including the Lending SPV's operating agreements, Hao and Qidian have failed to respond.

73. Section 5 of each Note states: "For purposes of this Note, an "Event of Default" includes each of the following:…(b) the Issuer's termination of its operations or taking of steps or actions in connection with its dissolution or liquidation…(d) the Issuer's failure to timely observe or perform any other provision of this Note.  If the Issuer fails to cure an Event of Default within Sixty (60) days, the Investor may at is option, declare this Note (including, without limitation, all accrued interest) due and payable immediately regardless of the applicable maturity date…"  With respect to BH Quincy LLC (the Lender SPV for the DC Property), the charter was terminated by Hao in August 2019.  Likewise the QPOINT 23 LLC charter is currently "pending inactive" for failure to file all renewal documentation. These would trigger an Event of Default under Section 5 of the respective Notes.

74. Section 5.01 of each Subscription Agreement states the following, or language to substantially similar effect:

> *If Builder wrongfully fails to construct the home on schedule*, within construction loan limit, or fails to pass County or State required residential construction inspections resulted in failure of issuance of permits, or fails to inform Partner on unavoidable changes in construction, or conflict with or violation to any presently existing law, rule, regulation, order, writ, judgment, injunction, decree, determination or award applicable to Company, Consortium, or the construction project prior to or during the Contract, or if Company shall otherwise breach or default under any of the provisions of this Contract, *then, provided Company has received written notice from Purchaser specifying the nature of the breach or default but Company fails to cure the specified breach or default within thirty (30) days after receipt of the notice, Company shall return Partner the Capital Contribution in cash or its equivalence in lump sum. Within the same thirty (30) days, Company shall also return Purchaser the outstanding Guaranteed Return* as calculated based on the method specified in section

4.2 with the start date as the date of the defined start date in section 4.1.1 and the end date as the date of mutually agreed early termination date or the payout date, whichever is later. Purchaser shall retain all rights to sue for further remedy.

(Emphasis added.)

75. After emails to Qidian and Hao on August 12, 2019, October 15, 2019, October 28, 2019, November 4, 2019, February 12, 2020, and multiple times between February and April 2020, all of which emails requested repayment and/or status of repayment on Plaintiffs' funds, on September 22, 2020, Ms. Du, on behalf of Plaintiffs, provided notice to Qidian through electronic means, as provided in Section 7.2 of each Subscription Agreement, explicitly demanding repayment of each Loan following the maturity thereof. Qidian and Hao failed to respond to most of this email correspondence, including the September 22, 2020 emails. Undersigned also sent a demand letter on January 25, 2021 to the same email address, with similar results.

76. The language in Section 5.01 of the Subscription Agreement regarding the developer's inability to complete the projects would trigger a repurchase obligation by Qidian and the Lending SPVs, which has not been honored despite due notice properly given.

77. Qidian and each Lending SPV have defaulted under the respective Notes and Subscription Agreements by violating each of the provisions cited immediately above. Any one of these events of default, much less all of them, entitle Plaintiffs to full repayment of their investment principal and stated interest under the terms of the Note.

78. Furthermore, Hao and Qidian paid off another investor (with surname "Lan") who requested her investment back for the DC Property. While Plaintiffs do not have the operating agreements for each Lending SPV in their possession due to Qidian and Hao's

refusal to provide them, under the terms of such operating agreements, upon information and belief, monies received by the Lending SPVs would be distributed on a pro rata basis to each investor thereunder.  To the extent funds have been received, Hao and Qidian have violated the stated terms of the operating agreement and their fiduciary duties as manager of the applicable Lending SPV.  Alternatively, to the extent funds were not received, it would work a fraud on the market for Qidian and/or Hao to repay one investor their investment funds but not others who are likewise requesting redemption.  In either case, such selective repayment was improper.

## COUNT I

## VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5

79. Plaintiffs re-allege and incorporate by reference each and every allegation in paragraphs 1 through 79, inclusive, as if they were fully set forth herein.

80. By engaging in the conduct described above, Defendants' sale of the membership interests constituted an investment contract, and hence a sale of securities, under the definition of securities set forth by Section 2(a)(1) of the Exchange Act.

81. Defendants knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use of means or instrumentalities of interstate commerce, or the mails, or other means of communication:

   a) employed devices, schemes, or artifices to defraud;

   b) as alleged above, made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

82. By engaging in the foregoing conduct, Defendants violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 106-5 [17 C.F.R. § 240.106-5], thereunder.

83. Under Section 20 of the Exchange Act, 15 U.S.C. § 78t, Hao and Yuan were "controlling persons" of Qidian and each of the Lending SPVs, as they owned Qidian and dictated all daily business activities, correspondence, company policy, marketing and solicitation materials and strategies.  Accordingly, they can and should be held personally liable as if acting in their own individual capacity at all times.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request:

(a) A judgment against Defendants determining that the sale of membership interests in the various Lender SPVs to Plaintiffs by Defendants was procured by a material misrepresentation and/or omission, contrary to the provision of the Exchange Act and Rule 10b-5, promulgated pursuant to the Act [17 C.F.R. § 240.10b-5].

(b) A judgment against Defendants in the amount of Plaintiffs' loss, the exact amount to be determined at trial, together with interest.

(c) Attorneys fees and costs.

(d) Any and all other relief that appears to the Court equitable under the circumstances.

Respectfully submitted,

LAW OFFICE OF BRIAN GORMLEY,
LLC

By___/s/_____
    Brian Gormley, Esq.  Bar #488494

10605 Concord Street
Suite 420
Kensington, Maryland 20895
(240) 514-2358 (T)
(866) 594-5652 (F)
*brian@gormleylawoffice.com*

*Attorney for Plaintiffs*

## **VERIFICATION**

I solemnly affirm and declare under the penalties of perjury that the consents of the foregoing Complaint are true and correct to the best of my knowledge, information and belief.

YUEPING DU
BY: JIE DU, HIS POWER OF ATTORNEY

FEI CHEN
BY:JIE    DU,    HER    POWER    OF

ATTORNEY